UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:   3/25/2025

WILMINGTON TRUST, NATIONAL
ASSOCIATION, AS TRUSTEE FOR THE
BENEFIT OF THE REGISTERED HOLDERS
OF WELLS FARGO COMMERCIAL
MORTGAGE TRUST 2018-C44,
COMMERCIAL MORTGAGE PASS-
THROUGH CERTIFICATES, SERIES 20,

    Plaintiff,

  -against-

31 PRINCE STREET, LLC, et al.,

    Defendants.

22-CV-5855 (JGK) (BCM)

**REPORT AND RECOMMENDATION
TO THE HON. JOHN G. KOELTL**

**BARBARA MOSES, United States Magistrate Judge.**

  Plaintiff Wilmington Trust, National Association, is the Trustee for the Benefit of the Registered Holders of Wells Fargo Commercial Mortgage Trust 2018-C44, Commercial Mortgage Pass-Through Certificates, Series 2018-C44 (the Trust). The Trust is the successor-in-interest to Argentic Real Estate Finance LLC (Argentic), which loaned $41 million in March 2018 to 31 Prince Street, LLC and Wah Kok Realty Corp. (together, the Borrowers), secured by a mortgage on certain of the Borrowers' real properties. On July 8, 2022, plaintiff brought this action against the Borrowers and others, seeking, *inter alia*, to foreclose on the mortgage.

  On May 25, 2023, the Hon. John G. Koeltl, United States District Judge, granted plaintiff's motion for summary judgment as to foreclosure, *see Wilmington Tr. v. 31 Prince St.*, 2023 WL 3647397 (S.D.N.Y. May 25, 2023) (*Wilmington Tr. II*), and referred the case to me to calculate the amount owed. *Id.* at *4. For the reasons that follow, I respectfully recommend that a judgment of foreclosure be entered awarding plaintiff: (a) the unpaid principal balance on the loan, which is $41,000,000; (b) ordinary interest at the rate of 5.34% per annum, which amounts to $6,665,506.67 as of May 6, 2024 (the latest date for which plaintiff provides a calculation), plus additional interest

accrued, at the same rate, through the date on which the judgment of foreclosure is entered; (c) default interest at the rate of an additional 5.00% per annum, compounded monthly, which amounts to $10,078,098.02 as of May 6, 2024; (d) late payment charges for the 25-month period from the Borrowers' default on April 6, 2020 through plaintiff's acceleration of the loan on April 6, 2022, amounting to $368,219.54; (e) tax advances, other property protective advances, and fees in the aggregate amount of $1,730,374.86 (but no interest on these sums); (f) attorneys' fees in the amount of $179,219.40 and expenses in the amount of $14,565.33, plus additional attorneys' fees, if any, incurred through the date on which the judgment of foreclosure is entered; (g) special servicing fees at the rate of approximately $284.72 per day, which amounts to $351,916.74 through May 6, 2024, plus additional special servicing fees, at the same rate, through the date on which the judgment of foreclosure is entered; (h) a Yield Maintenance Premium of $2,050,000; and (i) a liquidation fee, calculated as 1% of the amounts set forth in items (a), (b), (e), (g), and (h), incurred if and when the properties underlying the Mortgage are sold at auction.

## I.    BACKGROUND

### A.    Procedural Background

On March 14, 2018, Borrowers obtained a loan in the amount of $41,000,000 (the Loan) from Argentic. *See Wilmington Tr. v. 31 Prince St.*, 2023 WL 414249, at *1 (S.D.N.Y. Jan. 25, 2023) (*Wilmington Tr. I*); Declaration of Joao Gauer (Gauer Decl.) (Dkt. 103) ¶ 4. The Loan was made pursuant to a loan agreement (the Loan Agreement), evidenced by a promissory note (the Note), and secured by a mortgage (the Mortgage) granting Argentic a security interest in three of the Borrowers' properties (at 31 Prince Street, 46 Prince Street, and 48 Spring Street, all in New York, New York), including their leases and rents (collectively, the Property). *See Wilmington Tr. I*, 2023 WL 414249, at *1; Gauer Decl. ¶¶ 4-6 & Exs. 2 (Loan Agreement), 3 (Note), 4 (Mortgage).

Through "a series of allonges," Wilmington Trust acquired from Argentic "all of right, title and interest in" the Note and Mortgage. *Wilmington Tr. I*, 2023 WL 414249, at *1.[1]

      The Borrowers were required to make an interest-only payment on the 6th of each month, calculated at the rate of 5.34% per annum. Gauer Decl. ¶ 9; Loan Ag. § 1.1, at 6, 11; *id*. § 2.2.1. They failed to remit the required sum on April 6, 2020, and ceased making any payments at all on October 6, 2020. Gauer Decl. ¶ 11. On April 7, 2022, plaintiff declared a default (as of April 6, 2020), revoked Borrowers' license to collect the rents and profits generated by the mortgaged premises, and accelerated the Loan. *Id*. ¶ 12 & Ex. 6. This action quickly followed.

      On January 25, 2023, Judge Koeltl appointed Richard J. Madison as Receiver to manage the properties during the litigation. *Wilmington Tr. I*, 2023 WL 414249 at *5. On May 25, 2023, he granted summary judgment to plaintiff on its foreclosure claims. *Wilmington Tr. II*, 2023 WL 3647397, at *1. Additionally, the district judge entered a default against defendant New York City Office of Administrative Trials and Hearings (which did not appear), severed plaintiff's claim against defendant Edmond Li, who guaranteed the Loan,[2] and referred the case to me for "a calculation of the amount owed by the [Borrowers] on the Loan." *Id.* at *3-4

---

[1] On April 24, 2018, the parties to the Loan Agreement split the $41,000,000 Note into Note A-1 (in the principal amount of $30,000,000) and Note A-2 (in the principal amount of $11,000,000). *See* Gauer Decl. ¶ 7 & Ex. 5. On May 1, 2018, in connection with the securitization of the Loan (*see* Loan Ag. § 9.1(a)(iii)), Wilmington Trust, as Trustee, Rialto Capital Advisors, LLC (Rialto), as Special Servicer, and other parties entered into a Pooling and Service Agreement (PSA), which, among other things, described the Special Servicer's duties and set out its compensation. *See* Gauer Decl. ¶ 2 & Ex. 1 (PSA).

[2] Plaintiff asked to sever its claim against the Guarantor "because, at a later date, the plaintiff may still seek a deficiency judgment against the Guarantor in the event that an auction of the Property results in a deficiency with respect to the amount due and owing to the plaintiff." *Wilmington Tr. II*, 2023 WL 3647397, at *4.

**B.    The Parties' Contentions**

On August 9, 2023, plaintiff filed a brief in support of its proposed computation (Pl. Brief) (Dkt. 102), supported by (i) the declaration of Joao Gauer, who calculated the total amount due on the Loan as of August 6, 2023 (exclusive of unpaid legal fees and costs) to be $60,610,184.42, *see* Gauer Decl. ¶ 14 & Sched. A; and (ii) the declaration of Keith M. Brandofino, who calculated that plaintiff had incurred $184,017.00 in legal fees and $14,959.97 in costs in connection with this action. Brandofino Decl. (Dkt. 104) ¶ 12.[3] Gauer supported his calculation with numerous exhibits. However, Brandofino did not submit any contemporaneous timesheets to substantiate the claimed fees or any invoices or other documentation to substantiate the claimed expenses.

In its brief, plaintiff argued that the only issue remaining for decision is "the amount due and owing on the Loan," and urged the Court to accept the calculations made by Gauer and Brandofino. Pl. Br. at 4.[4] Plaintiff acknowledged that Gauer's calculations did not address the monies collected by the Receiver, but argued that those amounts are not now at issue, and will not be at issue until a future foreclosure auction "yields an amount sufficient or nearly sufficient to make Plaintiff whole," at which point any surplus would be paid to plaintiff. *Id*. at 4-5.[5] Plaintiff requests that the Court grant a final judgment in its favor on Counts I, II, and III of the Complaint

---

[3] Gauer is an asset manager at the Special Servicer. Gauer Decl. ¶ 2. Brandofino is one of plaintiff's attorneys in this action. Brandofino Decl. ¶ 1.

[4] In particular, plaintiff argued, "the law of the case doctrine bars any attempt by Borrowers to re-litigate this Court's findings regarding [the Borrower's] commission of the April 6, 2020 Payment Default." Pl. Br. at 3. The default date is significant because it triggers the running of default interest, among other things. *See* Part II(C), *infra*.

[5] According to the Receiver's monthly reports for December 2024, the property owned by 31 Prince Street, LLC generated $875,547.57 in net income during 2024, and maintained a cash balance of $1,100,277.29 at year end. (Dkt. 144-1, at ECF p. 4.) The property owned by Wah Kok Realty Corp. generated $1,538,901.29 in net income during the same period, and maintained a cash balance of $1,705,684.81 at year end. (Dkt. 144-2, at ECF p. 4.)

(the foreclosure counts) and appoint Madison (currently the Receiver) "as referee for purposes of conducting the public foreclosure auction of the Property pursuant to Real Property Actions and Proceedings Law ('RPAPL') § 1351." *Id.* at 1, 5.

In their responding brief, filed on September 15, 2023, the Borrowers argued that this Court "is not bound by any prior ruling or determination" as to the date of default, because no such ruling was made. Def. Brief (Dkt. 107) at 4. In addition, according to the Borrowers, plaintiff failed to establish the reasonableness of its requested attorneys' fees and costs because it failed to submit its contemporaneous time records, or "any evidence of the professional experience and background of each attorney and paralegal who has worked on this matter to justify the hourly billing rate of each such person[,]" and likewise failed to substantiate its claimed expenses. *Id.* at 7-8. An accompanying declaration, signed by defendants' counsel, Slava Hazin, recapitulated the same arguments concerning the requested attorneys' fees and expenses. Hazin Decl. (Dkt. 108) ¶¶ 6-11.

Notwithstanding their (correct) observation that the district judge did not specifically address the date of default, *see Wilmington Tr. II*, 2023 WL 3647397, at *1-3, the Borrowers did not challenge any aspect of plaintiff's calculation of the amount due under the Loan Agreement. Instead, attorney Hazin argued that "[e]ven if Plaintiff's calculation of damages is technically correct, the magnitude of the claimed damages – a *47.5% increase* over the original, principal amount – is manifestly unfair and shocks the conscience." Hazin Decl. ¶ 5. Hazin requests that the Court use its equitable discretion "to reduce the nearly $8 million in default interest requested by Plaintiff at an interest rate in excess of 10%." *Id.* ¶ 4 n.1.

In their reply brief, filed on September 25, 2023, plaintiff argued that "generalized notions of equity and benefits cannot supplant the terms and conditions of the written agreement," Pl. Reply (Dkt. 110) at 3 (quoting *U.S. Bank N.A. v. NNN 200 Galleria, LLC*, 2014 WL 11380950, at

*6 (S.D.N.Y. July 21, 2014)), adding that "each of Plaintiff's proposed damages components are rooted in express terms of the Loan Documents, which reflects the fruits of the bargain that Borrowers, themselves, struck with Original Lender." *Id.* Plaintiff then insisted (without citing any specific language in *Wilmington II*) that this Court "determined Borrowers to have committed the Payment Default on April 6, 2020," such that they "cannot dispute April 6, 2020 as the accrual date for interest and default interest[.]" *Id.* at 4. Additionally, plaintiff submitted another declaration from attorney Brandofino, attaching counsel's detailed time records, as well as "resumes and biographies of the primary attorneys who are billed on this matter" and invoices reflecting various costs for which reimbursement is sought. Brandofino Supp. Decl. (Dkt. 109) ¶¶ 4-10 & Exs. A-G.

After requesting and receiving leave to file a sur-reply (*see* Dkt. 112), attorney Hazin asked the Court to reduce the requested fees by "at least 30% to 40%," Hazin Sur-Reply Decl. (Dkt. 114) ¶ 31, because (i) counsel's time records feature "at least 20 separate instances of block billing, for a total exceeding $30,000," *id.* ¶ 15, and (ii) "Plaintiff's counsel . . . overstaffed and over litigated" what is "nothing more than a routine mortgage foreclosure action" involving simple issues. *Id.* ¶ 23. The Borrowers further argued that the Court should disallow reimbursement of $12,743 for an "audit of Borrower's books and records" because the associated invoice "contains no explanation of the services that were allegedly rendered." *Id.* ¶ 29.

Following a telephonic conference held on April 18, 2024, the Court directed plaintiff to file supplemental materials updating and clarifying its calculation of the amount owed on the Loan. (Dkt. 124.) On June 11, 2024, plaintiff submitted the declaration of Javier Callejas, another asset manager at Rialto, calculating the amount due on the Loan as of May 6, 2024 (exclusive of unpaid legal fees and costs) to be $62,063,346.72. Callejas Decl. (Dkt. 131) ¶ 3 & Sched. A. Callejas

attaches Rialto's "payoff reconciliation," broken down into 14 tabs: the Consolidated Summary Tab, Callejas Decl. Ex. A-1; the A-1 Note Summary Tab, *id*. Ex. A-2; the A-2 Note Summary Tab, *id*. Ex. A-3; the A-1 Amort., DI, SS, YM Tab, *id*. Ex. A-4; the A-2 Amort., DI, SS, YM Tab, *id*. Ex. A-5; the A-1 Loan Transaction History Tab, *id*. Ex. A-6; the A-2 Loan Transaction History Tab, *id*. Ex. A-7; the Appian Invoices Tab, *id*. Ex. A-8; the A-1 SS Fees Tab, *id*. Ex. A-9; the A-2 SS Fees Tab, *id*. Ex. A-10; the A-1 IOAs Tab, *id*. Ex. A-11; the A-2 IOAs Tab, *id*. Ex. A-12; the A-1 Defeasance Tab, *id*. Ex. A-13; and the A-2 Defeasance Tab. *Id*. Ex. A-14.

On July 12, 2024, the Borrowers submitted a short response to plaintiff's updated calculations in the form of another declaration by attorney Hazin, who concedes that plaintiff's updated calculations "appear to be mathematically correct," but questions "how a mortgage loan in the principal amount of $41 million ballooned to over $62 million – an increase of over 51% – and whether this Court, in the exercise of its broad equitable powers and sound discretion, can permit Plaintiff to reap such a windfall." Hazin Supp. Decl. (Dkt. 135) ¶ 3.

## II.    DISCUSSION

Under RPAPL § 1321, in an action to foreclose a mortgage, "the court shall ascertain and determine the amount due, or direct a referee to compute the amount due to the plaintiff." It is plaintiff's burden to prove the amount due "with reasonable certainty." *Wells Fargo Bank as Tr. for the Benefit of the Holders of COMM 2015-LC19 Mortg. Tr. Com. Mortg. Pass-Through Certificates v. 5615 Northern LLC*, 2023 WL 7394340, at *3 (S.D.N.Y. May 4, 2023) (citing *Hosking v. New World Mortg., Inc.*, 570 F. App'x 28, 31 (2d Cir. 2014) (summary order)). "Any determination of damages in an action for foreclosure and sale 'should be determined under the terms of the . . . governing instruments,'" *Eastern Sav. Bank, FSB v. Rabito*, 2014 WL 4804872, at *1 (E.D.N.Y. Sept. 10, 2014) (quoting *Builders Bank v. Rockaway Equities, LLC*, 2011 WL 4458851, at *5 (E.D.N.Y. Sept. 23, 2011)), unless those terms are "unconscionable," that is, "so

grossly unreasonable or unconscionable in the light of the mores of business practices of the time and place as to be unenforceable according to [their] literal terms." *Wells Fargo Bank Nat'l Ass'n as Tr. for Holders of Com. 2014-UBS6 Mortg. Tr. Com. Mortg. Pass-Through Certificates v. 366 Realty LLC*, 725 F. Supp. 3d 272, 284 (E.D.N.Y. 2024) (quoting *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 121 (2d Cir. 2010); *accord Gillman v. Chase Manhattan Bank, N.A.*, 73 N.Y.2d 1, 10, 537 N.Y.S.2d 787, 791 (1988).

A party raising the defense of unconscionability must show "that the contract was both procedurally and substantively unconscionable when made – i.e., some showing of an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *Gillman*, 73 N.Y.2d at 10, 537 N.Y.S.2d at 791 (internal quotation marks and citations omitted). Here, the Borrowers argue in broad terms that "the magnitude of the claimed damages . . . is manifestly unfair and shocks the conscience," Hazin Decl. ¶ 5, but have failed to make either of the required showings to sustain a claim of unconscionability. They present no evidence suggesting that their decision to execute the Loan Agreement was anything other than free and rational. Nor do they explain how, if at all, the accrual of default interest at a combined rate of 10.34% (or the imposition of the various fees authorized by the Loan Agreement) deviates from "the mores and business practices of the time and place." *Gillman*, 73 N.Y.2d at 10, 537 N.Y.S.2d at 791. Indeed, courts in our Circuit routinely enforce similar (and substantially higher) default interest rates. *See, e.g.*, *366 Realty*, 725 F. Supp. 3d at 284 (holding that a combined default rate of 10.817% "is far below the legal rate in New York" and "certainly does not approach the unconscionability standard of 'grossly unreasonable' or 'outrageous'") (citation omitted); *LG Cap. Funding, LLC v. Solar Energy Initiatives, Inc.*, 2019 WL 7630792, at *4 (E.D.N.Y. Nov. 1, 2019) (finding a default interest rate of 22% enforceable

and collecting similar cases), *adopted,* 2020 WL 364078 (E.D.N.Y. Jan. 22, 2020).[6] Since "generalized notions of equity and benefits cannot supplant the terms and conditions of the written agreement," *NNN 200 Galleria*, 2014 WL 11380950, at \*6, I will assess plaintiff's requested damages – listed in Schedule A to the Callejas declaration – in accordance with the parties' contracts.

### A.    Principal Amount

There is no dispute as to the principal amount of the loan, which is $41 million. Loan Ag. § 2.1. The parties agreed that "the Monthly Debt Service Payment amount due on any Payment Date shall first be applied to the payment of interest accrued during the preceding Interest Period and the remainder of such Monthly Debt Service Payment Amount shall be applied to the reduction of the unpaid Principal." *Id.* § 2.2.1. Because the Borrowers' payments on Notes A-1 and A-2 never exceeded the Monthly Debt Service Payment Amount, there was nothing to apply to the reduction of the unpaid Principal. *See* Callejas Decl. ¶ 4; *id*. Ex. A-6 (A-1 Loan Transaction History); *id.* Ex. A-7 (A-2 Loan Transaction History). Defendants do not contest this amount. *See* Hazin Supp. Decl. ¶ 3. Thus, plaintiff is entitled to the full $41 million in unpaid principal.

---

[6] By the same token, the Borrowers have failed to persuade me that this Court should reduce the default interest rate as a matter of "equity." *See* Hazin Decl. ¶ 4 n.1. There is nothing inherently inequitable about a 10.34% default interest rate. *See Wilmington Tr., Nat'l Ass'n v. Winta Asset Mgmt. LLC*, 2024 WL 1700032, at \*2 (S.D.N.Y. Apr. 18, 2024) (Koeltl, J.) (declining to "lower the default interest rate as a matter of equity" where it was "'well below' the 25% usury cap under New York law") (citation omitted). Moreover, the cases cited by the Borrowers are inapposite. For instance, in *Deutsche Bank Nat'l Tr. Co. v. Armstrong*, the Second Department explained that the exercise of a court's equitable discretion in a foreclosure action "will be governed by the particular facts in each case, including any wrongful conduct by either party." 218 A.D.3d 738, 739, N.Y.S.3d 8, 10 (2d Dep't 2023) (citation omitted). The court then reduced the award of accrued interest because plaintiff had inexplicably delayed in bringing suit. *Id*. (reasoning that plaintiff "should not benefit financially in the form of accrued interest" during the period of delay). Here, plaintiff sued promptly. Nor do defendants point to any other conduct that would make enforcement of the default interest rate unjust.

### B.    Accumulated Non-Default Interest

The "Interest Rate," as defined in the Loan Agreement, is 5.34% per annum, Loan Ag. § 1.1, at 6, "computed on the basis of the actual number of days elapsed over a 360-day year." *Id.* § 2.5.2; *see also* Callejas Decl. ¶ 5 (calling this the "Non-Default Rate"). Plaintiff "has recovered monies from the Property to cover interest through May 6, 2021, Gauer Decl. ¶ 19; *see also* Callejas Decl. ¶ 9, but not thereafter. Consequently, "$6,665,506.67 of unpaid interest has accumulated" on the unpaid principal balance "at the Non-Default Rate over the course of 1,096 days spanning commencing May 6, 2021 through and including May 6, 2024 on a 360-day year basis." Callejas Decl. ¶ 10 & Sched. A. Defendants do not contest this calculation. Plaintiff is therefore entitled to $6,665,506.67 in non-default interest as of May 6, 2024, plus additional non-default interest calculated, on the date of entry of the judgment of foreclosure and sale, using the following formula: (($41,000,000 * 0.0534)/360) * [number of days elapsed since May 6, 2024]. Callejas Decl. ¶ 10.

### C.    Accumulated Default Interest

The "Default Rate," as defined in the Loan Agreement, is "a rate per annum equal to the lesser of (i) the maximum rate permitted by applicable law, or (ii) five percent (5%) above the Interest Rate, compounded monthly." Loan Ag. § 1.1, at 4. Once an "Event of Default" has occurred, *see id*. § 2.2.2, interest at the Default Rate accrues on "the entire unpaid Debt . . . from the date such payment was due or such underlying Default . . . occurred," *id.* § 2.2.2, meaning it accrues not just on the unpaid principal but also on "all interest accrued and unpaid thereon, any Yield Maintenance Premium and all other sums due to Lender in respect of the Loan or under any Loan Document." *Id.* § 1.1, at 4.

As relevant here, an Event of Default occurs when "any portion of the Debt is not paid when due." Loan Ag. § 8.1(a). Although Judge Koeltl did not make a specific finding as to the

date of the initial Event of Default, the evidence now before this Court shows that it was in fact April 6, 2020.[7] The Borrowers offer no conflicting evidence. Consequently, calculation of the default interest, with respect to both the A-1 Note and the A-2 Note, is properly performed on a compounded monthly basis from that date. Callejas Decl. ¶ 11-12. For example, plaintiff calculates the default interest assessed as of May 6, 2020 on the A-1 Note (in the principal amount of $30,000,000) by multiplying the previous month's running balance ($30,000,000) by 5% and then by 30 days (the number of days between April 6 and May 6) divided by 360 days (30,000,000 * 0.05 * (30/360)). This yields the sum of $125,000. Callejas Decl. ¶ 12 & Ex. A-4. The running balance then becomes $30,258,500, which includes both the $125,000 in default interest (at 5%) and the $133,500 in ordinary interest (at 5.34%) accrued over the same month. *Id.* On June 6, 2020, the next installment of default interest is calculated by multiplying the May 6 running balance ($30,258,500) by 5% and then by 31 days (the number of days between May 6 and June 6) divided by 360 days ($30,258,000 * 0.05 * (31/360)). This yields the sum of $130,279.65. *Id.*

Applying the same calculation each month through May 6, 2024, "yields a sum of $7,374,218.06 of accumulated, default interest on the A-1 Note and $2,703,879.96 of accumulated, default interest on the A-2 Note," totaling $10,078,098.02 of accumulated unpaid default interest as of May 6, 2024. Callejas Decl. ¶¶ 13-14; *see also id.* Exs. A-4, A-5. Again, the Borrowers do not contest the calculation. *See* Hazin Supp. Decl. ¶ 3.

---

[7] *See* Gauer Decl. ¶ 11; *id.* Ex. 6; Callejas Decl. ¶ 6 ("A review of the Loan Transaction History reveals that, through and including March 2020, Borrowers timely remitted monthly debt service payments on the Loan. *See* Ex. A-6, A-7 ("PAYMENT REC'D" reflected on each Effective Date and Due Date). However, while Borrowers thereafter remitted payment towards the April 2020 Payment Date, the check was returned as a result of there being insufficient funds in Borrowers' account, thereby resulting in the occurrence of the Payment Default. *Id.*").

Default interest has, in theory, continued to accrue. However, since the calculation of compound interest "is a function of variables that change each month (i.e., the Running Balance and number of days that elapsed in the previous month)," plaintiff states that it cannot provide "a method to compute accumulated default interest through a future date without knowing the future date." Callejas Decl. ¶ 12 n.6. The Court appreciates the point, but notes that plaintiff easily could have calculated the accumulated default interest as of the 6th of each future month (or as of any other future dates it selected). Rather than doing so, plaintiff calculated the default interest only through May 6, 2024 (one month prior to the date of the Callejas declaration). Since it is plaintiff's burden to establish its damages with "reasonable certainty," *Hosking*, 570 F. App'x at 31, I recommend that the Borrowers be assessed $10,078,098.02 – but no more – in accumulated unpaid default interest. *See*, *e.g.*, *RSS WFCM2018-C44-NY LOD, LLC v. 1442 Lexington Operating DE LLC*, 2024 WL 4486058, at *4 (S.D.N.Y. Aug. 19, 2024) (recommending that plaintiff be awarded accumulated default interest through March 6, 2023, the last date for which it provided any calculation), *adopted*, 2024 WL 4132554 (S.D.N.Y. Sept. 10, 2024), *judgment entered,* 2024 WL 4381120 (S.D.N.Y. Oct. 2, 2024).

### D.    Late Payment Charge

Section 2.5.3 of the Loan Agreement provides:

> If any Principal, interest or other sum due under any Loan Document is not paid by Borrower on the date on which it is due, Borrower shall pay to Lender upon demand an amount equal to the lesser of five percent (5%) of such unpaid sum or the maximum amount permitted by applicable law[.]

Because Borrowers did not pay the required Monthly Debt Service Payments from April 6, 2020 through April 6, 2022 (at which point plaintiff accelerated the loan), plaintiff requests $368,219.54 in Late Payment Charges ($306,134.68 on the A-1 Note and $62,084.86 on the A-2 Note) for those 25 months. Callejas Decl. ¶¶ 16-17; *id*. Exs. A-6, A-7. Defendants do not contest

this amount. *See* Hazin Supp. Decl. ¶ 3. Consequently, I recommend that defendants be assessed a late payment charge in the amount of $368,219.54.

       **E.**       **Tax Advances, other Property Protective Advances, and Fees**

Plaintiff asserts that the Borrowers' indebtedness includes various advances made by plaintiff on their behalf to protect its security interest in the Property, including $1,631,971.65 in tax advances and $97,228.21 in other "Property Protective Advances," as well as certain fees properly assessed to the Borrowers, including a $25 NSF (non-sufficient funds) fee and a $1,150 payoff fee. Callejas Decl. ¶ 18.

Plaintiff relies on § 5.29(a)(vii) of the Loan Agreement, which provides:

> Borrower shall pay or, if Borrower fails to pay, reimburse Lender upon receipt of notice from Lender for all reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees and disbursements) incurred by Lender or Servicer in connection with the Loan, including . . . enforcing or preserving any rights in response to third party claims or the prosecuting or defending of any action or proceeding or other litigation, in each case against, under or affecting Borrower, the Loan Documents, the Property, or any other security given for the Loan.

Additionally, § 8.2.5 of the Loan Agreement provides:

> Lender may, but shall have no obligation to, perform, or cause performance of, such covenant or obligation, and all reasonable costs, expenses, liabilities, penalties and fines of Lender incurred or paid in connection therewith shall be payable by Borrower to Lender upon demand and if not paid shall be added to the Debt (and to the extent permitted under applicable laws, secured by the Mortgage and other Loan Documents) and shall bear interest thereafter at the Default Rate.

"Courts in this Circuit allow plaintiffs in foreclosure actions to recover such protective advances where the plaintiff submits sufficient documentation to prove the accuracy of its claims." *5615 Northern*, 2023 WL 7394340, at *7. Here, the Borrowers do not challenge plaintiff's ability to recover the advances and fees listed above. Nor do they contest the amounts sought, which are reflected in the Payoff Reconciliation. *See* Callejas Decl. ¶¶ 18-19 & Exs. A-6, A-7, A-8, A-11, A-12. Consequently, the requested sums should be awarded to plaintiff.

Plaintiff also requests $995,493.37 in interest accrued on the advances it made to protect its interest in the Property. Callejas Decl. ¶ 18. Plaintiff states that it has provided "detailed breakdowns of the respective interest on advances for both the A-1 Note and A-2 Note." *Id.* However, the "breakdown" charts, *see id.* Exs. A-11, A-12, simply list the "interest advance" recorded each month on each Note. They do not reveal the interest rate that plaintiff applied to the advances or the method used to compute that interest. Nor, for that matter, does plaintiff explain what advances it seeks interest on – *beyond* the tax advances, the other property protective advances, the NSF fee and the payoff fee, discussed above. *See* Callejas Decl. ¶ 18 (attesting that "$995,493.37 of interest has accrued on the aforementioned *and other advances*") (emphasis added).[8] Since plaintiff has failed to "submit[] sufficient documentation to prove the accuracy of its claims" as to interest on the advances, *5615 Northern*, 2023 WL 7394340, at *7, I recommend that no such interest be awarded.

## F.    Attorneys' Fees and Costs

In a foreclosure case, the court may award attorneys' fees and costs to the plaintiff "where there is 'sufficiently clear' contractual language providing for such an award, provided those fees are 'reasonable.'" *1442 Lexington Operating DE*, 2024 WL 4486058, at *6 (quoting *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 175 (2d Cir. 2008)). Here, the contractual language is clear: "Borrower shall pay or, if Borrower fails to pay, reimburse Lender upon receipt of notice from Lender for all reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees and disbursements) incurred by Lender or Servicer in connection with the Loan[.]"

---

[8] Schedule A to the Callejas declaration does not help. Schedule A lists the same figure – $995,493.37 – as "*Estimated* Interest on Advances" (emphasis added), without any indication as to how that sum was estimated or which portion (if any) reflects future interest on future advances. Moreover, Schedule A, like the body of the Callejas declaration, is silent as to *which* advances generated the $995,493.37 in interest, what rate was charged, or how the interest was computed.

Loan Ag. § 5.29. Plaintiff seeks $236,476.97 in attorneys' fees and costs, including $184,017 in legal fees through June 30, 2023, *see* Brandofino Decl. ¶¶ 8-14; $14,959.97 in costs as of July 13, 2023, *id.* ¶ 11: $35,000 in "anticipated" legal fees through the date of the foreclosure auction, *id.* ¶ 13; and $2,500 in future costs connection with the publishing of a notice of sale. *Id.*

Plaintiff submits the following chart, setting out the hours billed by the Holland & Knight, LLP (H&K) personnel at who worked on this case between June 1, 2021 and March 27, 2023:

| HOLLAND & KNIGHT LLP (TIMEKEEPERS' FEES 6/1/21 -3/27/23) | | | | |
|---|---|---|---|---|
| Timekeeper | Position | Effective Rate | Hours | Fees |
| Keith M. Brandofino | Partner | $685.00 | 31.30 | $21,461.50 |
| Michael J. Jo | Partner | $590.00 | 4.70 | $2,780.00 |
| David V. Mignardi | Partner | $525.00 | 135.10 | $70,961.00 |
| Brandon King | Associate | $495.00 | 9.40 | $4,653.00 |
| Baron C. Giddings | Associate | $440.00 | 156.40 | $69,080.00 |
| Yemi Adewuyi | Associate | $475.00 | 1.20 | $474.00 |
| Kathy Ovalle | Paralegal | $220.00 | 52.70 | $11,542.50 |
| Brunie Colon | Paralegal | $225.00 | 2.20 | $495.00 |
| Patti Green | Paralegal | $225.00 | 0.50 | $112.50 |
| Brianna Perez | Practice Asst. | $315.00 | 3.20 | $1,008.00 |
| Elvin Ramos | Special Asst. | $270.00 | 1.90 | $511.00 |
| Glenn M. Huzinec | Special Asst. | $190.00 | 4.50 | $862.50 |
| Gustavo Manuela Cruz | Special Asst. | $190.00 | 0.40 | $76.00 |
| TOTAL | | | | $184,017.00 |

Brandofino Decl. ¶ 8. In his supplemental declaration, attorney Brandofino also submits the following additional documentation:

(a)     93 pages of H&K invoices, *see* Brandofino Supp. Decl. Ex. A;

(b)     Resumes and biographies of the "primary attorneys" who worked on this matter, including Brandofino, Michael H. Jo, David V. Mignardi, Brandon Len King, and Baron Giddings, *see* Brandofino Supp. Decl. Ex. B;

(c)     An email confirming that a payment of $402.00 was processed in the Southern District of New York, in order to file the complaint herein, *see* Brandofino Supp. Decl. Ex. C;

(d)     An invoice from Fidelity National Title Insurance Services, dated March 8, 2022, reflecting $925.44 incurred by Holland & Knight in connection with

services rendered for foreclosure searches, *see* Brandofino Supp. Decl. Ex. D;

(e)  An invoice from Fidelity National Title Insurance Services, dated September 27, 2022, reflecting $136.10 incurred by H&K in connection with services rendered for title continuation searches, *see* Brandofino Supp. Decl. Ex. E;

(f)  Invoices reflecting $356.79 incurred by plaintiff in connection with services rendered for service of process of filings in this action, *see* Brandofino Supp. Decl. Ex. F; and

(g)  An invoice from FTI Consulting, addressed to Stuart Rich at Rialto, reflecting $12,743.00 "incurred by Plaintiff in connection with, *inter alia*, services rendered for an audit of Borrower's books and records with respect to this action, the Loan and the Property." Brandofino Supp. Decl. ¶ 10 & Ex. G.

### 1.    Attorneys' Fees

"[A]n award of attorneys' fees pursuant to a contractual provision may only be enforced to the extent that the amount is reasonable and warranted for the services actually rendered." *Exec. Risk Indemn., Inc. v. Fieldbridge Assocs. LLC*, 642 F. App'x 25, 25 (2d Cir. 2016) (summary order) (cleaned up); *see also CARCO GROUP, Inc. v. Maconachy*, 718 F.3d 72, 86 (2d Cir. 2013) ("[T]he touchstone for an award of attorneys' fees pursuant to a contract is reasonableness."); *Proimmune Co., LLC v. Holista Colltech Ltd.*, 2024 WL 54281, at *1 (S.D.N.Y. Jan. 4, 2024) (where the contract "unmistakabl[y]" entitles plaintiff to a fee award, the court must still "examine whether Plaintiff's request is reasonable") (citation omitted).

"The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany*, 522 F.3d 182, 186 (2d Cir. 2008) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)). This calculation yields a "presumptively reasonable fee," commonly referred to as the "lodestar." *Millea v. Metro-North R.R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011) (quoting *Arbor Hill*, 522 F.3d at 183). Although

developed for use in civil rights actions, "the same principle has been applied to awards of contractual attorney's fees." *Byline Bank v. SDS Dining Corp.*, 2024 WL 1422812, at *5 (S.D.N.Y. Apr. 3, 2024) (collecting cases). Within this broad mandate, the district court has "considerable discretion" in determining the amount of the award. *Arbor Hill*, 522 F.3d at 190.

Three partners, three associates, three paralegals, one "practice assistant," and three "special assistants" worked on this matter during the relevant period. Brandofino Decl. ¶ 8. The partners' hourly rates ranged from $525 to $685, and the associates' rates ranged from $440 to $495. *Id.* The paralegals' rates ranged from $220 to $225, the rate of the "practice assistant" was $315, and the rates of the "special assistants" ranged from $190 to $270. *Id.*

According to their firm biographies, *see* Brandofino Supp. Decl. Ex. B, the primary attorneys who worked on this matter have experience handling similar matters. Further, the attorneys' hourly rates are reasonable, and within the range of rates approved for similar legal work by other courts in this district. *See 1442 Lexington Operating DE*, 2024 WL 4486058, at *6-7 (approving rates for H&K attorneys, including Brandofino and Mignardi, with an average partner/counsel rate of $568.75 per hour, and an average associate rate of $425 per hour); *see also 5615 Northern LLC*, 2023 WL 7394340, at *8 (approving rates for H&K attorneys, including Brandofino and Mignardi, with an average partner/counsel rate of $606.81 per hour, and an average associate rate of $454.58 per hour). However, plaintiff's requested rates of $220 and $225 per hour for paralegals, $315 per hour for a practice assistant, and $190 and $270 per hour for the firm's "special assistants" are unduly high. In this district, an hourly rate of $150 is reasonable for non-attorneys performing work on similar matters. *See 1442 Lexington Operating DE*, 2024 WL 4486058 at *7; *5615 Northern*, 2023 WL 7394340, at *8.

As to the number of hours billed, I find the 403.5 hours spent working on this action to be reasonable. *See 1442 Lexington Operating DE*, 2024 WL 4486058 at *7 (512.1 hours reasonable in a similar matter); *5615 Northern*, 2023 WL 7394340, at *8 (approximately 342 hours reasonable in a similar matter). Further, after reviewing H&K's contemporaneous time records, I conclude that while there are some instances of block billing, they do not "frustrate[] meaningful review of the reasonableness of the claimed hours," *Hines v. City of Albany*, 613 F. App'x 52, 55 (2d Cir. 2015) (summary order), and therefore do not warrant an across-the board cut. Consequently, I recommend that plaintiff be awarded the requested fees for the H&K partners and associates ($169,409.40), but that the hourly rate for all non-attorneys be reduced to $150. Since the non-attorneys worked a total of 65.4 hours on this matter, this will result in fees of $9,810 for all non-attorneys. In sum, plaintiff should be awarded attorneys' fees in the amount of $179,219.40.

## 2.  Costs

To recover costs and other expenses, a prevailing party must properly substantiate those expenses with receipts, invoices, or – at a minimum – a sworn statement by an attorney. *See Fisher v. SD Prot. Inc.*, 948 F.3d 593, 600 (2d Cir. 2020) ("The fee applicant must submit adequate documentation supporting the requested attorneys' fees and costs."); *Rosales v. Gerasimos Enter. Inc.*, 2018 WL 286105, at *2 (S.D.N.Y. Jan. 3, 2018) (awarding costs based on a sworn statement by attorney under penalty of perjury).

The original Brandofino declaration enumerates the following individual costs, aggregating $14,959.97:

i.  Filing Fee Notice of Pendency: $105.00

ii.  Filing Fee Complaint/Opening Case Docket: $402.00

iii.  Title Searches:

a.  Foreclosure Search: $925.44

          b.       Continuation Search - UCC and Tax: $136.10

    iv.       Service of Pleadings: $356.79

    v.       Service of Court: $137.50

    vi.       Delivery Charges: $154.14

    vii.       Audit of Borrower's Books and Records: $12,743.00

Brandofino Decl. ¶ 11.

The exhibits attached to the supplemental Brandofino declaration provide documentary evidence for all of these costs *except* the $105 filing fee for the notice of pendency, the $137.50 "service of court" fee, and the $154.14 in "delivery charges." Brandofino Supp. Decl. Exs. C-G. These three items should therefore be disallowed. The Borrowers also object to the request for reimbursement of $12,743 for an audit of Borrower's books and records (by F.T.I. Consulting), because the invoice "contains no explanation of the services that were allegedly rendered." Hazin Sur-Reply Decl. ¶ 29. The invoice is indeed skimpy. *See* Brandofino Supp. Decl. Ex. G. But financial auditors, unlike attorneys, are not required to keep detailed timesheets, and the Borrowers do not suggest that F.T.I. Consulting did not perform the invoiced services or that they were not reasonably necessary in connection with this action. Consequently, I recommend that plaintiff be awarded $14,565.33 in costs. *See 1442 Lexington Operating DE*, 2024 WL 4486058, at *7 (awarding $14,787.50 in costs in similar case).

Finally, I recommend that the Court deny plaintiff's request for $35,000 in "anticipated" legal fees and $2,500 in "anticipated" costs in connection with the publishing of a notice of sale. *See, e.g.*, *OneWest Bank, N.A. v. Hawkins*, 2016 WL 11088904, at *10 (E.D.N.Y. July 1, 2016), ("While the Court acknowledges that counsel's anticipated fees may likely be incurred, it cannot recommend that plaintiff receive payment for services not yet provided."), *adopted*, 2016 WL

4384725 (E.D.N.Y. Aug. 17, 2016). Instead, plaintiff should be permitted to renew the request at such time as it has actually incurred and can substantiate those fees and expenses.

### G.    Special Servicing Fee

Under the Loan Agreement, the Lender has the right to retain a Servicer (including pursuant to the PSA), and the Borrowers are required to "pay any reasonable fees and expenses of Servicer" under certain circumstances, including "in connection with the enforcement of the Loan Documents." Loan Ag. § 10.3; *see also id*. § 5.29(a)(viii) (Borrowers must pay or reimburse Lender for the "reasonable fees charged by Servicer"). The PSA, in turn, sets forth a Special Servicing Fee assessed at the rate of 0.25000% per annum, computed on the unpaid principal balance of the subject loan. PSA at 109-10.

As to the A-1 Note, plaintiff calculates a daily Special Servicing Fee of approximately $208.33 (($30,000,000 * 0.0025)/360). Callejas Decl. ¶ 21. As to the A-2 Note, the daily Special Servicing Fee is approximately $76.39 (($11,000,000 * 0.0025)/360). *Id*.[9] From December 17, 2020 to May 6, 2024 (1236 days), plaintiff calculates that $257,499.92 in Special Servicing Fees was incurred on the A-1 Note and $94,416.82 was incurred on the A-2 Note. *Id.* ¶ 22. Defendants do not contest this calculation. *See* Hazin Supp. Decl. ¶ 3. Plaintiff is therefore entitled to $351,916.74 in Special Servicing Fees as of May 6, 2024, plus additional Special Servicing Fees that may be calculated, on the date of entry of the judgment of foreclosure and sale, using the following formula: (($41,000,000 * 0.0025)/360) * [number of days elapsed since May 6, 2024].

---

[9] There are several typographical errors in ¶ 21 of the Callejas declaration, but the end product of the computation appears to be correct.

### H.    Yield Maintenance Premium

Plaintiff seeks a Yield Maintenance Premium in the amount of $2,050,000. Callejas Decl.

¶ 23. The Loan Agreement provides that, if the "Debt is accelerated by reason of an Event of

Default," the lender "shall be entitled to receive, in addition to the unpaid Principal and accrued

interest and other sums due under the Loan Documents, an amount equal to the Yield Maintenance

Premium applicable to such Principal so accelerated." Loan Ag. § 2.3.1. Here, the "Principal so

accelerated" was $41 million.

The "Yield Maintenance Premium" is defined as follows:

> [A]n amount equal to the greater of (i) five percent (5%) of any applicable
> prepayment, or (ii) an amount which, when added to the outstanding Principal,
> would be sufficient to purchase U.S. Obligations which provide payments (a) on or
> prior to, but as close as possible to, all successive scheduled payment dates under
> this Agreement through the Stated Maturity Date and (b) in amounts equal to the
> Monthly Debt Service Payment Amount required under this Agreement through the
> Stated Maturity Date together with the outstanding principal balance of the Note as
> of the Stated Maturity Date assuming all such Monthly Debt Service Payment
> Amounts are made (including any servicing costs associated therewith). In no event
> shall the Yield Maintenance Premium be less than zero.

*Id.* § 1.1, at 16.

After performing both of the calculations set forth in the Loan Agreement, Callejas reports

that the first option – simply taking 5% of the accelerated principal – produces the greater amount,

which is $2,050,000. Callejas Decl. ¶ 24. Therefore, plaintiff submits, in accordance with §§ 1.1

and 2.3.1 of the Loan Agreement, it is entitled to $2,050,000 for its Yield Maintenance Premium.

*Id.* Once again, defendants raise no challenge. Hazin Supp. Decl. ¶ 3; *see also Wilmington Tr.,*

*Nat'l Ass'n v. Winta Asset Mgmt. LLC*, 2023 WL 9603893, at *7-8 (S.D.N.Y. Dec. 21, 2023)

(Koeltl, J.) (rejecting defendants' argument that the Yield Maintenance Premium was an

"unenforceable penalty," and awarding $150,000, equal to 1% of the unpaid principal balance of

the loan), *adopted,* 2024 WL 1700032 (S.D.N.Y. Apr. 18, 2024). I therefore recommend that plaintiff be awarded $2,050,000 in Yield Maintenance Premium.

### I.     Liquidation Fee

As noted above, the Borrowers must reimburse plaintiff for "any reasonable fees charged by Servicer[.]" Loan Ag. § 5.29(a)(viii). The PSA provides for a "Liquidation Fee," payable to the Special Servicer, computed as a percentage of the "Liquidation Proceeds," as follows:

> A rate equal to 1.00% with respect to any Specially Serviced Loan . . . ; *provided* that if such rate would result in an aggregate Liquidation Fee less than $25,000, then the Liquidation Fee Rate will be equal to the lesser of (i) 3.00% and (ii) such lower rate as would result in an aggregate Liquidation Fee equal to $25,000.

PSA § 1.01, at 58. The Liquidation Proceeds, in turn, are defined as the "Cash amounts received by or paid to the . . . Special Servicer in connection with," among other things, "the liquidation (including a payment in full) of a Mortgaged Property or other collateral constituting security for a Defaulted Loan . . . through a . . . foreclosure sale . . . or otherwise, exclusive of any portion thereof required to be released to the related Mortgagor in accordance with applicable law and the terms and conditions of the related Mortgage Note and Mortgage[.]" *Id.*

According to Callejas, the Liquidation Proceeds in this case are $52,793,297.62 (calculated through May 6, 2024), "which is the sum of the Loan's $41,000,000.00 Principal Balance, $6,665,506.67 of Accumulated Interest, a $25 NSF Fee, $995,493.37 of Interest on Advances, $1,631,971.65 of Tax Advances, $97,228.21 of Property Protective Advances, $351,916.74 of Special Servicing Fees, a $2,050,000.00 Yield Maintenance Premium, and $1,150.00 Payoff Fees[.]" Callejas Decl. ¶ 28. Therefore, plaintiff posits, it "has incurred a Liquidation Fee of $527,932.76, or 1% of the Liquidation Proceeds. *Id.* ¶ 29.

Defendants do not contest this calculation. *See* Hazin Supp. Decl. ¶ 3. However, until there is a liquidation – that is, a foreclosure sale – no Liquidation Fee can be "incurred." Between now

22

and then, some of the variables making up the Liquidation Proceeds will change. Moreover, for the reasons stated above, I have recommended against allowing any recovery for another variable, namely, the requested $995,493.37 of interest on advances. *See* Part II(E), *supra*. I therefore recommend that the judgment of foreclosure include a liquidation fee "in an amount to be determined following the foreclosure sale." *5615 Northern*, 2023 WL 7394340, at *12. Assuming the sufficiency of the auction proceeds, that amount will be 1% of: (i) the $41,000,000.00 principal balance on the Loan; (ii) the accumulated ordinary interest (at 5.34%), calculated through the date of entry of the judgment of foreclosure; (iii) the $25 NSF fee; (iv) the $1,631,971.65 of tax advances; (v) the $97,228.21 of other property protective advances; (vi) the Special Servicing Fees, calculated through the date of entry of the judgment of foreclosure; (vii) the $2,050,000.00 Yield Maintenance Premium; and (vii) the $1,150.00 payoff fees.

## III.    CONCLUSION

For the reasons set forth above, I recommend, respectfully, that a judgment of foreclosure be entered awarding plaintiff: (a) the unpaid principal balance on the Loan, which is $41,000,000; (b) ordinary interest at the rate of 5.34% per annum, which amounts to $6,665,506.67 as of May 6, 2024, plus additional interest accrued, at the same rate, through the date on which the judgment is entered; (c) additional default interest in the amount of $10,078,098.02; (d) late payment charges in the amount of $368,219.54; (e) tax advances, other property protective advances, and fees in the aggregate amount of $1,730,374.86; (f) attorneys' fees in the amount of $179,219.40 and expenses in the amount of $14,565.33, plus additional attorneys' fees and costs, if any, incurred through the date on which the judgment of foreclosure is entered; (g) special servicing fees at the rate of approximately $284.72 per day, which amounts to $351,916.74 through May 6, 2024, plus additional special servicing fees, at the same rate, through the date on which the judgment of foreclosure is entered; (h) a Yield Maintenance Premium of $2,050,000; and (i) a liquidation fee,

23

calculated as 1% of the amounts set forth in items (a), (b), (e), (g), and (h), incurred if and when the properties underlying the Mortgage are sold at auction and the proceeds are sufficient to support the fee.[10]

Dated: New York, New York
      March 25, 2025

**BARBARA MOSES**
**United States Magistrate Judge**

## NOTICE OF PROCEDURE FOR FILING OF OBJECTIONS
## TO THIS REPORT AND RECOMMENDATION

      The parties have 14 days from this date to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), unless they receive this Report and Recommendation solely by mail, in which case they have 17 days from the date on which it was mailed. *See* Fed. R. Civ. P. 6(a), 6(d). Any objections must be filed with the Clerk of the Court, addressed to the Hon. John G. Koeltl, and delivered to Judge Koeltl in accordance with his individual practices. Any request for an extension of the deadline to file objections must also be directed to Judge Koeltl. **Failure to file timely objections will result in a waiver of such objections and will preclude appellate review.** *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Frydman v. Experian Info. Sols., Inc.*, 743 F. App'x 486, 487 (2d Cir. 2018) (summary order); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010).

---

[10] As noted above, plaintiff also requests the appointment of Richard J. Madison as referee to conduct the foreclosure auction pursuant to RPAPL § 1351. My reference, however, was limited to the calculation issues set forth in this Report and Recommendation.